# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| BLOCKCHAIN ASSOCIATION, TEXAS BLOCKCHAIN COUNCIL, DEFI EDUCATION FUND | CASE NO.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| *Plaintiffs*, | |
| v. | |
| INTERNAL REVENUE SERVICE, UNITED STATES OF AMERICA, UNITED STATES DEPARTMENT OF THE TREASURY, and JANET YELLEN, in her official capacity as Secretary of the Department of the Treasury, | |
| *Defendants*. | |

Nathan W. Giesselman*
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
525 University Ave.
Palo Alto, CA 943010

Juliana D. Hunter
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1000 Louisiana St., Ste. 6800
Houston, TX 77002

Randy D. Gordon
Jason E. Boatright
Joseph M. Cox
Craig M. Warner
Lucas Wohlford
DUANE MORRIS LLP
100 Crescent Ct., Ste. 1200
Dallas, TX 75201

Shay Dvoretzky*
Christopher P. Bowers*
Parker Rider-Longmaid*
Steven Marcus*
Hanaa Khan*
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005

Alexander C. Drylewski
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001

Roger C. Diseker
DUANE MORRIS LLP
777 Main St., Ste. 2790
Fort Worth, TX 76102

*Attorneys for Plaintiffs Blockchain Association, Texas Blockchain Council, and DeFi Education Fund*
*\*Pro hac vice motion forthcoming*

Plaintiffs Blockchain Association, Texas Blockchain Council, and DeFi Education Fund bring this action for violations of the Administrative Procedure Act (APA), 5 U.S.C. § 500 *et seq.*, and the U.S. Constitution, and allege as follows:

## INTRODUCTION

1.      This case is about unlawful and unconstitutional overreach by the Department of the Treasury and the Internal Revenue Service (IRS) that threatens to destroy one of America's cutting-edge, innovative technologies: decentralized finance (DeFi). DeFi software allows people to buy, sell, and exchange digital assets directly with each other, without the need for expensive and unsecure third-party intermediaries—*i.e.*, brokers. These technological advances provide significant benefits for countless Americans, including the ability to transact quickly, securely, and cheaply across the globe.

2.      Many of those benefits are possible only because DeFi enables direct user-to-user transactions, without brokers. Traditional finance and banking depend on intermediaries like brokers, and that is exactly why they are often inaccessible, expensive, or unattractive for many Americans, especially those who value their privacy from large institutions and the government. DeFi, in contrast, does not rely on intermediaries like brokers. Instead, users maintain custody over their own digital assets and transact directly with each other using software. There is simply no broker-like entity involved in a decentralized transaction.

3.      Despite many comments explaining that point and urging it to reconsider its proposed course, Treasury adopted a rule, Doc. No. 2024-30496, *Gross Proceeds Reporting by Brokers that Regularly Provide Services Effectuating Digital Asset Sales* (Dec. 27, 2024) (Final Rule), requiring DeFi industry participants that are not brokers to act as brokers—a requirement that will effectively end the DeFi industry. Specifically, Treasury has purported to redefine the statutory term "broker," which *Congress* defined to reach only those who, "for consideration," "effectuat[e] transfers of digital assets on behalf of another person," 26 U.S.C. § 6045(c)(1)(D), to reach anyone who provides a "trading front-end

- 1 -

service" or "other effectuating services," even if they do so for free and even if the service does not itself effectuate transfers. Final Rule ¶ (a)(21)(iii)(B). The Final Rule purports to require DeFi industry participants to follow onerous reporting requirements, which Congress designed for actual brokers, for *every transaction*.

4.      Complying with those requirements is impossible if DeFi is to remain what it is, because complying with those requirements would require DeFi entities to *become* brokers when their defining characteristic is that they are not intermediaries. That is, the Final Rule requires the creation and insertion of intermediaries that do not exist—indeed, whose absence is the entire crux of DeFi's innovation—and whose existence would destroy DeFi's direct user-to-user framework, subject users to all the risks inherent with intermediated transactions, and deprive people of their choice to transact without relying on expensive, unsecure third-party intermediaries. But even if DeFi industry participants could somehow comply, doing so would be so cost-prohibitive—requiring participants to spend many billions of dollars, in the aggregate, to fill out billions of IRS forms—that it would functionally destroy the industry. Many if not most DeFi companies and developers will move overseas or shutter altogether, with drastic consequences for DeFi users.

5.      That all will have been the result of a rule that is both unlawful and unconstitutional. It is unlawful in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 500 *et seq*, because it exceeds Treasury's authority by rewriting the statute Congress wrote. That statute authorizes the IRS to require reporting from entities who "effectuat[e] transfers of digital assets," 26 U.S.C. § 6045(c)(1)(D), but DeFi's innovation is that users effectuate their own transactions with each other. The Final Rule also violates the APA's procedural requirements, because Treasury failed to engage in reasoned decisionmaking: In its haste to enact its misguided Rule, Treasury failed to consider the substantive comments made by thousands of parties during the comment period, detailing how the Proposed Rule would result in the elimination of America's DeFi industry. *See Gross Proceeds and Basis*

*Reporting by Brokers and Determination of Amount Realized and Basis for Digital Asset Transactions*, 88 Fed. Reg. 59,576 (Aug. 29, 2023) (Proposed Rule). And when Treasury did try to justify the Final Rule, it failed to conduct the required cost–benefit analysis. That violates the APA's requirement that an agency action be "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024).

6.      It is helpful to provide some context. America's blockchain technology companies, including DeFi industry participants, are carrying on a storied tradition of financial innovation that America has long encouraged and protected. From mutual funds to digital payment technologies, American startups have made a major difference in the lives of Americans and American businesses and communities concerned about privacy, limited government, and efficient and reliable financial transactions. Digital assets and DeFi software protocols represent another step forward, as leaders from across the political spectrum have recognized: Former President (and President-elect) Donald Trump declared that "[c]rypto is the future" and is an "incredible technology,"[1] while Vice President Kamala Harris pledged to "encourage innovative technologies like … digital assets."[2]

7.      Digital assets, including cryptocurrencies like Bitcoin, are digital representations of value. In simple terms, this is how they work: Anyone with an internet connection can purchase a digital asset, store it, and send or receive currency anywhere in the world without involving a third party. Digital assets exist on blockchains, which are decentralized, digital databases that record and store transactions. Every transaction is recorded in a block added to the end of an existing chain—the blockchain—producing a ledger of every transaction. The resulting blockchain is public: anyone can see the "blocks" on the chain. The technology prevents fraud because the blocks cannot be tampered

---

[1] Donald Trump (@realDonaldTrump), Twitter/X (Oct. 15, 2024, 7:04 PM), https://x.com/realDonaldTrump/status/1846326266011762820.

[2] Mike Allen, *Harris Embraces Crypto, in Overture to Young Men*, AXIOS (Sept. 23, 2024), https://www.axios.com/2024/09/23/harris-embraces-crypto-overture-young-men

with and are available for all to see. The result is that unlike traditional banking, which relies on inter-mediaries, digital asset transactions can be virtually instant, costless, and secure—because they can go from user to user, without the wasted time, expense, and security vulnerabilities of third parties.[3]

8.      Holders of digital assets can use either centralized businesses or decentralized proto-cols to transact with their assets. Centralized businesses are akin to traditional financial intermediaries. Users make an account with the business and deposit their assets to the business. The business then stores users' digital assets on their behalf in a wallet application that the business controls. Those businesses hold custody of users' assets in order to effectuate transactions—be it a payment, exchange, etc.—on behalf of their customers.

9.      Holders of digital assets can also use decentralized trading protocols. As the name suggests, those protocols do not involve a third-party centralized operator. Instead, decentralized pro-tocols allow users to transact with their digital assets while maintaining custody over them using "self-custodial" or "non-custodial" wallet applications, so named because no institution or entity takes or maintains custody of the assets in the wallet applications, similar to keeping cash in a physical wallet. To transfer digital assets to or from non-custodial wallet applications, users rely not on platforms or other intermediaries, but on open-source protocols accessible through their personal devices. Those protocols are sometimes built into non-custodial wallet applications, but may also be accessible via separate websites. A key aspect of these decentralized protocols is that they do not have "account" relationships with their users.

---

[3] For more background on blockchain technology, *see, e.g.*, Resources, BLOCKCHAIN ASSOCI-ATION (last visited Dec. 27, 2024), https://theblockchainassociation.org/resources-2/; Education, COIN CENTER (last visited Dec. 27, 2024), https://www.coincenter.org/education/; Learn, COINDESK (last visited Dec. 27, 2024), https://www.coindesk.com/learn/.

10.     Given the benefits of transacting with digital assets, it is not surprising that the sector has grown rapidly and considerably. Digital assets are valued at over $3 trillion, and American companies are leading the way to ensure that the technology continues to develop, allowing Americans with limited or no access to traditional finance to transact with significantly fewer costs and increased privacy.

11.     But all of that will come to naught if the Court does not put an end to Treasury's unlawful and unconstitutional Rule requiring DeFi industry participants who are not brokers to act and report to the IRS as brokers. Congress requires brokers to submit reports to the IRS. In the 2021 Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, § 80603, 135 Stat. 1339 (2021), Congress added a new definition of broker specific to digital assets, defining it as "any person who (for consideration) is responsible for regularly providing any service effectuating transfers of digital assets on behalf of another person." 26 U.S.C. § 6045(c)(1)(D).

12.     Critically, Congress considered trying to apply these rules to DeFi, but ultimately decided not to—and for good reason, since DeFi does not involve brokers. BA Comment Letter 5. But Treasury paid no heed to the definition Congress enacted. In a misguided effort to apply the "broker" rules to DeFi, Treasury redefined "broker" to reach any entity that provides a "trading front-end service" and is "in a position to know the nature of the transaction potentially giving rise to" proceeds. Final Rule p. 109. That executive lawmaking goes far beyond Congress's definition—and all where Congress has delegated Treasury no authority to define who a broker is, much less to destroy an industry in the process to which Congress decided *not* to apply broker-based reporting requirements.

13.     The consequence of Treasury's expansive and atextual interpretation is that entities that would never be considered brokers under *Congress's* definition now face the risk of being subject to the onerous—and in many cases, impossible—reporting requirements of Treasury's regime. By definition, DeFi involves decentralized transactions that lack a "broker." Treasury cannot extend its

power over entities that Congress has not given it authority to regulate. *Cf. National Association of Private Fund Managers v. SEC*, No. 4:24-CV-00250-O, 2024 WL 4858589, at *2 (N.D. Tex. Nov. 21, 2024). In fact, as explained further below, the Final Rule raises serious Fifth Amendment concerns because it is unclear just how far the Final Rule reaches.

14.    And the Final Rule imposes a crushing burden: It requires DeFi industry participants to collect and store users' sensitive personal identifying information and file reports with the Internal Revenue Service (IRS) documenting *each and every transaction* in which users of their technology engage, as well as including cost-basis information the participants entirely lack, even though it may be impossible for them to do so precisely because they are not brokers in the ordinary (and Congress's) sense of the term. And it is just as time consuming as it sounds—in the IRS's own estimation, the compliance time burden for the digital asset industry will be more than *four billion hours annually* with an expected compliance financial burden of more than *$260 billion annually*. Joint Second Paperwork Reduction Act Letter (Exhibit 5) 4, 6; BA Paperwork Reduction Act Letter (Exhibit 3) 2-3. For perspective, the forms required by the Final Rule will increase the total paperwork burden created by the entire United States government by about one-third. BA Paperwork Reduction Act Letter 3.

15.    Burden aside, the Final Rule makes no sense, and compliance is impossible even if it is not cost-prohibitive, given how DeFi and blockchain technology works. DeFi represents a transformative technology that allows consumers to transact directly with each other—without the need for third-party intermediaries like banks or other financial service companies. Transactions are recorded and verified on a publicly available ledger, without any intermediary. DeFi transactions occur on open-source protocols that, once published, are not owned or controlled. Those protocols include standards, codes, and procedures written by software developers that self-execute the transaction between two or more users once the conditions are met. Put simply, the essence of blockchain and DeFi—and what makes them capable of providing liquidity and privacy while mitigating intermediary

risk and opening up and revolutionizing low-cost finance—is that they remove the very bank-like intermediaries that might be in a position to report on transactions.

16.     If the Final Rule stands, America's DeFi community will be unable to comply, because it is technologically impossible to do so; because most participants—many of them startups—cannot afford the staggering costs of compliance; or both. And even if software companies can afford to comply, compliance will existentially change the software offerings, which are not designed to collect identifying information, monitor transactions, or report information to the IRS. As a result, many, if not most, DeFi-related companies caught up in the Final Rule will either relocate overseas or will shutter entirely. That will hurt users, who will transition to using offshore services that may be less trustworthy and do not have to comply with IRS reporting requirements. That would be a devastating blow to America's role in the continued modernization of finance.

17.     Fortunately, it is this Court's job, not Treasury's, to "determine the best reading" of the term "broker." *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2247 (2024). And because the Final Rule goes beyond what Congress required in purporting to impose burdensome reporting requirements on DeFi, it exceeds Treasury's authority. The major questions doctrine underscores that point by requiring clear congressional authorization before presuming an agency's authority to impose such a drastic result as wiping out an enormous and emerging industry that has support from both sides of the aisle. There is no such clear authorization here.

18.     The Final Rule is also arbitrary and capricious, in violation of the APA, 5 U.S.C. § 706(2)(A), because it does not reflect reasoned decisionmaking. Indeed, Plaintiffs and other commenters explained to Treasury that the Proposed Rule was outside Treasury's authority, did not make sense given the nature of DeFi, and would impose billions of hours and hundreds of millions of dollars in compliance burdens. As Plaintiffs explained, because some DeFi industry participants are decentralized by design, developers of such software may not know the identity of the users who transact

using such systems or stand in a position to collect or store the names and taxpayer ID numbers of those who transact in digital assets. What is more, amending the software code to require collection of such information is simply not feasible in most cases, or would fundamentally change the business model of the DeFi participant. For these same reasons, the Final Rule is arbitrary and capricious because it treats DeFi and traditional finance similarly without any recognition of the critical differences between the two, much less substantial evidence showing how the Final Rule's benefits could possibly be worth its costs. In concluding otherwise, Treasury failed to adequately respond to substantial comments and ignored an important aspect of the problem.

19.    Finally, the Final Rule is unconstitutional. It is contrary to the Fourth Amendment twice over: It invades the privacy rights of the participants to a transaction, and it amounts to an unconstitutional search of the entities who are required to first collect, and then report, vast quantities of information. And the Final Rule is contrary to the Fifth Amendment because it is so vague that it does not give fair notice to regulated parties as to whether the extremely onerous reporting regimes even apply to those parties at all—not least of all because the Final Rule purports to extend to an entity "in a position to know the nature of the transaction potentially giving rise to gross proceeds from a sale of digital assets."

## PARTIES

20.    Plaintiff Blockchain Association is a 501(c)(6) nonprofit organization with over 100 members, including members in the Northern District of Texas. As the leading nonprofit membership organization dedicated to promoting a pro-innovation policy environment for the digital assets economy, Blockchain Association comprises leading software developers, infrastructure providers, exchanges, custodians, investors, and others supporting the public blockchain ecosystem. Blockchain Association endeavors to achieve regulatory clarity and to educate policymakers, regulators, and the courts about how blockchain technology can pave the way for a more secure, competitive, and

consumer-friendly digital marketplace. Blockchain Association is dedicated to fostering a thoughtful public policy environment for public blockchain networks so that they can develop and prosper in the United States.

21.     Plaintiff Texas Blockchain Council (TBC) is a nonprofit industry association that works to make the State of Texas the jurisdiction of choice for cryptocurrency, blockchain, and digital asset innovation. Its efforts are focused on advocating for blockchain-centric public policy initiatives, and it is committed to being the leading professional association and networking venue for the cryptocurrency industry. Its members include individuals and companies interested or engaged in digital asset and blockchain technology.

22.     Plaintiff DeFi Education Fund (DEF) is a 501(c)(4) nonpartisan nonprofit based in Washington, D.C., that advocates for and educates the public about sound DeFi policy. DEF focuses on explaining the benefits of decentralized finance to the public, achieving regulatory clarity for decentralized finance technology, and advocating for decentralized finance users, participants, and software and protocol developers working to create new decentralized finance products. DEF also owns and trades digital assets, including cryptocurrency, and receives donations of digital assets. DEF does not have members.

23.     Plaintiffs bring this action to safeguard their interests, as well as the interests of the entire blockchain industry and American consumers. As Plaintiffs expressed in their comment letters on the Proposed Rule, Plaintiffs are concerned about the sweeping and arbitrary nature of the Final Rule, which is the latest attempt by the Treasury Department to regulate the blockchain industry by stretching laws beyond their text in ways that do not make sense and create uncertainty and unjustified hardship for a major industry.

24.     If the Final Rule goes into effect, Plaintiffs, their members, and other participants in the blockchain industry will be subject to onerous regulations and compliance costs that will be so

high as to jeopardize their continued existence. Members of Plaintiffs Blockchain Association and TBC who cannot meet the reporting requirements will be forced to cease operating altogether, relocate overseas, or be subject to IRS enforcement actions. As core entities shutter, the entire U.S. blockchain industry will face the risk of collapsing.

25.    For these and other reasons, Plaintiffs and their members strongly opposed the Proposed Rule. *See, e.g.*, Exhibit 1 ("BA Comment Letter"); Exhibit 2 ("DEF Comment Letter").

26.    Defendant Internal Revenue Service (IRS) is a federal government agency located within the Department of the Treasury and charged with administering and supervising the execution and application of the internal revenue laws. The IRS maintains its principal offices in Washington, D.C.

27.    Defendant the Department of the Treasury is a federal government agency that oversees the Internal Revenue Service. The Department maintains its principal offices in Washington, D.C.

28.    Defendant United States of America acted through its agencies, the Department of the Treasury and the Internal Revenue Service.

29.    Defendant Janet Yellen is the United States Secretary of the Treasury, and is sued in her official capacity.

## JURISDICTION AND VENUE

30.    Plaintiffs bring this action under the APA, 5 U.S.C. § 500 *et seq.* This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

31.    Plaintiffs have standing to challenge the Final Rule because, as detailed below, the Final Rule will directly and adversely affect and injure the members of Plaintiffs Blockchain Association and TBC, groups with associational standing, and will injure Plaintiff DEF's organizational purposes.

32.     The Final Rule will require Blockchain Association's and TBC's members to spend significant resources to comply with the Final Rule. Treasury itself estimates that the average annual "time burden" to comply with the disclosure rule is 425 hours. 88 Fed. Reg. at 59,619. The result, the IRS's own Director of Digital Assets anticipates, is that the IRS will receive *eight billion* Form 1099-DA submissions. Indeed, Blockchain Association's and TBC's members will engage in many transactions each year, with each transaction requiring a new form. The Final Rule will thus require members to spend significant time filling out forms, as the IRS itself recognized. Blockchain Association's and TBC's members will also suffer significant financial harm and loss of time and resources, because the Final Rule will require them to develop new, bespoke software to attempt to comply. The Final Rule will force members, which include DeFi software and protocol developers, to write entirely new code and to edit existing code to comply with the Final Rule's mandatory reporting requirements. For some members, the Final Rule will require an immense expenditure of time; for others, it will impose a tremendous financial burden. In short, the Final Rule will fundamentally alter, and in many respects destroy, the DeFi community.

33.     Blockchain Association's and TBC's members also have standing to seek redress for their constitutional injuries, including Fourth and Fifth Amendment injuries. These members include individual users transacting on the blockchain who will suffer Fourth Amendment injuries from unconstitutional searches that would reveal their entire transaction histories and entities who likely fall into the Final Rule's expansive and vague definition of "broker," and thus will be compelled—many times redundantly—to collect and report vast quantities of information about parties to a transaction. Members will also suffer Fifth Amendment injuries because the vague and open-ended definitions in the Final Rule will leave them guessing as to whether they are covered by the Final Rule, in violation of their due process rights to fair notice of the law.

34.    Moreover, the interests Plaintiffs Blockchain Association and TBC seek to protect are germane to their organizational purposes, and neither the claims asserted nor the relief requested requires any individual members to participate in the suit.

35.    Separately, Plaintiff DEF has organizational standing because the Final Rule injures its organizational purposes. DEF's mission is to explain the benefits of decentralized finance to the public, achieve regulatory clarity for decentralized finance technology, and realize the transformative potential of decentralized finance for everyone. It advocates for decentralized finance users, participants, and developers working to create new decentralized finance products using blockchain technology. Among other things, DEF educates the public about decentralized finance; submits public comments on proposed rulemakings that impact decentralized finance; and meets with members of Congress to discuss decentralized finance and related issues.

36.    The Final Rule also causes DEF direct economic harms. DEF owns and trades digital assets, including cryptocurrency, and receives the vast majority of its donations in digital assets. By threatening the existence of the industry these digital assets operate in, the Final Rule has devalued Plaintiff DEF's digital assets. Moreover, as a holder of digital assets, DEF will suffer constitutional harms to its privacy, including Fourth Amendment harms, as a result of the Final Rule. DEF also holds governance tokens, and thus could be subject to the reporting requirements under the Final Rule.

37.    Venue is proper in this district under 28 U.S.C. § 1391(e) because defendants are agencies of the United States, no real property is involved, and Plaintiff Texas Blockchain Council resides in the Northern District of Texas, because its principal place of business is in Richardson, Texas, within the district. 28 U.S.C. § 1391(c).

## STATEMENT

### I.    Factual background

#### A.    The blockchain industry and digital assets

38.    Blockchains are a revolutionary technology that enable safe, secure, costless, and virtually instantaneous transactions. As the name suggests, blockchains comprise "blocks" and "chains." Blocks typically are data of transactional records. The blocks are linked together into a chain, block after block after block. Chains can be thought of as databases consisting of the blocks. Common examples of blockchains are Bitcoin, Ethereum, and Solana. (These terms also refer to the native digital assets associated with these blockchains.) Although blockchains may employ similar technology, different blockchains may have different user bases and different features.

39.    Blockchains are secure because they are specifically designed to prevent tampering with digital asset transaction records. Start with security through transparency. Blockchains are visible to everyone, and therefore also auditable by everyone, but no one can unilaterally alter the chain. That is because blockchain technology requires consensus to validate each transaction. To explain, every transaction involving a digital asset must be authorized by special members of the network ("validators") who authenticate each block that is added to the chain. Moreover, blockchains are decentralized: transaction data is stored in multiple copies in many places simultaneously, as opposed to one centralized entity or location. That makes tampering extremely difficult.

40.    Digital assets are digital representations of value recorded on a blockchain, including digital currencies and digital content, such as pictures, videos, music, and other art. Two of the most well-known types of digital assets are cryptocurrencies (digital currency) and non-fungible tokens, or NFTs (digital content such as art). Digital assets can be securely transferred, sold, or stored as collectibles.

41.    People acquire digital assets for all kinds of reasons. Some people prefer digital currencies over traditional money because digital currencies provide more privacy and can be transferred more easily. And even if a user typically uses traditional money, digital currencies can help diversify a financial portfolio. Other people seek out digital art as memorabilia.

42.    Anyone can create a digital asset. The process is similar to publishing any other piece of content.

43.    Transactions of digital assets are recorded in the blocks of a blockchain, which function as transactional records. For example, when an owner engages in a digital asset transaction, that transaction is included in a new block. When someone transfers a digital asset to someone else, the transaction is also included in a block. When someone buys a digital asset with U.S. dollars, the transaction is included in a block. The blocks are linked together into a chain, block after block after block.

44.    Cryptocurrencies are an important kind of digital asset. Anyone can purchase cryptocurrency with U.S. dollars so long as they have access to an internet connection. *See infra* ¶¶ 57-64 (describing centralized and decentralized exchanges). That cryptocurrency can then be used to purchase goods and services from household items to airline tickets as well as real estate.[4] Indeed, companies from Disney to Expedia to Walmart accept cryptocurrency.

45.    Bitcoin was the first cryptocurrency. The maximum total supply of bitcoin is 21 million, and there are approximately 19 million bitcoin currently in circulation. Thus, no more than 2 million additional bitcoin will ever be minted. This scarcity contributes to bitcoin's value.

46.    There are many other kinds of digital assets, including NFTs. NFTs are unique digital products whose authenticity and ownership can be verified by looking at the blockchain (which is

---

[4] *Where can I spend Bitcoin*, COINBASE HELP (last visited Dec. 27, 2024), help.coinbase.com/en/coinbase/getting-started/crypto-education/where-can-i-spend-bitcoin; Jenna Hall, *Can you buy a house with Bitcoin?*, BITCOIN MAGAZINE (May 26, 2022), bitcoinmagazine.com/business/can-you-buy-a-house-with-bitcoin.

publicly available), and which can typically point to a unique digital artwork or image. Purchasers of NFTs typically do not receive any physical asset; rather, the NFT itself is the collectible. For example, Nike launched a digital sneaker collection, Our Force 1, in 2023, which is available to members of its digital platform, .SWOOSH.[5] The digital sneakers are digital versions of Nike's most iconic Air Force 1s.[6]

47.    NFTs, like cryptocurrency, use blockchain technology and can be purchased on specialized secondary marketplaces. Once purchased, NFTs may be stored in a user's digital wallet application or transferred.

**B.    Digital wallet applications**

48.    Once a user acquires digital assets, those assets are stored in a digital wallet application. Users can engage in digital asset transactions through that digital wallet application.

49.    Digital wallet applications are software programs, typically browser extensions or mobile applications. Wallet applications use digital addresses called "public keys" and "private keys."

50.    Public keys are typically a pair of numbers used to identify a user on the blockchain. These keys are similar to a username—they can be shared with others to allow them to send assets to the user's wallet application. Public keys are typically derived from private keys.

51.    Private keys, in contrast, are more similar to PINs or passwords used in traditional banking—they are not to be shared. A user randomly selects a private key from an astronomically large range of numbers (approximately 1 through numbers 78 digits long), which makes it practically impossible that any two users will have the same private key. Often, wallet software will prompt users to use a mnemonic phrase, and then convert that phrase into a private key using an algorithm.

---

[5] *.SWOOSH Drops First Virtual Collection, Accelerating Nike's Digital Transformation*, NIKE (April 17, 2023), about.nike.com/en/newsroom/releases/swoosh-drops-first-virtual-collection.

[6] *Id.*

52.    The blockchain uses private keys to verify transactions and prove the user's ownership of the assets they are transacting with. Private keys can be used to determine a public key, but a public key can never expose a private key. Both the private and public keys are necessary to transact on the assets in a wallet application, providing an extra layer of security. As Treasury explained, only the private key holder has "the ability to transfer th[e] assets" in the wallet application. Final Rule p. 11 n.7.

53.    If a user chooses to involve a centralized business, that business maintains custody over the user's wallet application and the assets in it, including the private key. That wallet application is therefore considered "custodial."

54.    Decentralized finance uses non-custodial wallet applications, meaning the owner of the digital assets holds custody of the assets in their wallet application and controls those assets directly. With a non-custodial wallet application, the user typically stores their private keys locally on a device, such as a USB drive. This infrastructure enables the user to determine when and how to initiate the movement of their digital assets without using a third party. For many Americans, this technology provides an extra layer of security: a user can access the digital assets only with a particular personal digital device.

55.    Many non-custodial wallet applications offer some additional functionality beyond allowing users to control their private keys. For example, non-custodial wallet applications may include an interface through which users can access other platforms or protocols, such as centralized trading platforms or decentralized software protocols that enable users to engage in transactions involving digital assets directly with other users. Non-custodial wallet applications might also help a user translate a desired transaction into the proper and necessary computer language with which they interact with a protocol. DeFi participants can also use software extensions compatible with the non-custodial wallet application to make users' interactions with a protocol easier. Neither the wallet applications

nor their compatible extensions collect information about users, set up user accounts, or track user transactions. Nor do they give those who create and publish wallet software and tools (who are colloquially known as "wallet software developers") access to the user's wallet application; nor does it give wallet software developers access to any user or transaction information.

56.     To set up a non-custodial digital wallet, the user first selects the private key, and the software uses that private key to select a public key. No third party is needed to establish the wallet application or its keys. Neither the wallet software itself nor the software developers have control over the assets in the wallet application, and even the software developers are unable to access a user's private keys.

### C.     Centralized and decentralized exchanges and transactions

57.     People who hold digital assets can trade them through centralized businesses or decentralized protocols. Centralized businesses are intermediaries—similar to a digital version of a marketplace or stock exchange. Decentralized protocols involve no intermediary, just two users transacting with the protocol.

58.     Certain centralized parties create and operate platforms where users can send and receive digital assets. When a centralized entity holds user assets, customers typically reveal some personal information to the business when creating an account. These centralized businesses serve as intermediaries—similar to a digital version of a marketplace.

59.     To enlist the exchange's assistance, a user typically creates an account with the exchange. When a user involves a centralized exchange, the centralized exchange typically will take custody of the user's assets in the account.

60.     Centralized exchanges help alleviate the challenges users may experience trying to transact on a blockchain directly. Many new or more casual digital asset owners may not want to or have the time to learn how to conduct transactions on a blockchain themselves.

61.    Decentralized exchanges, in contrast, are peer-to-peer systems that do not involve any intermediary. Users keep their assets and private keys to themselves, and they transact directly with other users through the self-executing code of the DeFi system.

62.    Decentralized transactions work through "smart contracts." Despite the name, smart contracts are not like legal contracts. *Van Loon v. Department of Treasury*, 122 F.4th 549, 568-70 (5th Cir. 2024). Rather, smart contracts are self-executing software programs that automate the actions required to execute a blockchain transaction and permit users to safely and pseudonymously transact without any external authority, permission, or intermediary. The smart contract typically cannot be altered. *Id.* at 565. The code typically is also open-source and publicly available to review, use, and deploy by anyone in the world—once the code is published, nobody owns or controls it. *Id.* at 565-68. Indeed, that is why the Fifth Circuit in *Van Loon* held that smart contracts are not property: "they are not capable of being owned." *Id.* at 565.

63.    On decentralized exchanges, the user interacts with the system's smart contracts, which can be accessed with the help of software such as their non-custodial wallet application, through wallet extensions, or through other software. The Final Rule appears to characterize this software as "trading front-end services." None of this software is organized to collect reportable data, as it is maintained by software developers, not traditional intermediaries. This software is often free.

64.    The same users can transact on both centralized and decentralized exchanges—that is, digital assets can be traded and transferred on both types of exchanges, just as money or tangible assets can be traded through intermediaries or person to person.

### D.    Benefits of blockchains and digital assets

65.    Blockchains and digital assets have produced a number of critical benefits, from economic value and jobs to more widely available, cost-effective, and efficient transactions for individuals who might otherwise lack adequate access to financial services.

66.    Collectively, the digital asset market is valued at over $3 trillion. And Bitcoin alone is valued at approximately $1.9 trillion.[7] This industry has also generated hundreds of thousands of jobs for skilled workers, including programmers, engineers, and entrepreneurs.

67.    Blockchains and digital assets allow users to transact more quickly and with minimal transaction costs. Blockchain networks can handle international transactions in mere minutes as opposed to the hours or even days needed with traditional finance.[8] Moreover, it typically costs around $1 to transact on a blockchain network, and international transaction fees range from 1% to 3%.[9] Banks, by contrast, charge on average 12% in transaction fees.[10] The availability of lower transaction fees has driven down the transaction costs of sending money globally from 9.7% in 2009 to 6.2% in 2023.[11]

---

[7] Pablo D. Azar et al., *The Financial Stability Implications of Digital Assets* at 8 (Sept. 2022), newyorkfed.org/medialibrary/media/research/staff_reports/sr1034.pdf?sc_lang=en; *Bitcoin Price (BTC)*, COINBASE (last visited Dec. 27, 2024), coinbase.com/price/bitcoin.

[8] Rana Kortam, *Cryptocurrencies can improve speed, cost and ease of access of payments*, OMFIF (Jan. 2, 2023), https://www.omfif.org/2023/01/cryptocurrencies-can-improve-speed-cost-and-ease-of-access-of-payments/.

[9] Liz Mills, *10 Facts That Will Change Your Mind About Remittances and Crypto*, CRYPTO COUNCIL FOR INNOVATION (June 8, 2024), https://cryptoforinnovation.org/10-facts-that-will-change-your-mind-about-remittances-and-crypto/#:~:text=The%20use%20of%20crypto%20to,the%20US%20were%20in%20crypto.

[10] *Id.*

[11] *Id.*

68.    Blockchains and digital assets therefore open up access to financing for the nearly 20% of American adults who have limited or no access to traditional finance,[12] particularly among racial minorities.[13] Indeed, approximately 40% of Black Americans have traded in or used cryptocurrency.[14]

69.    Blockchains and digital assets likewise enable borrowers to obtain loans at lower interest rates, which decreases their risk of falling victim to predatory and discriminatory lending practices.[15]

70.    Americans with dependents living abroad also benefit from using cryptocurrencies to send financial support across borders without burdensome remittance fees.[16]

71.    Digital assets are used to support philanthropic goals. Over $2 billion has been donated to nonprofit organizations using cryptocurrency as of January 2024.[17] Some organizations have

---

[12] *2021 FDIC National Survey of Unbanked and Underbanked Households*, FEDERAL DEPOSIT INSURANCE CORPORATION (last updated July 24, 2023), fdic.gov/household-survey.

[13] Andrew Perrin, *16% of Americans say they have ever invested in, traded or used cryptocurrency*, PEW RESEARCH CENTER (Nov. 11, 2021), https://www.pewresearch.org/short-reads/2021/11/11/16-of-americans-say-they-have-ever-invested-in-traded-or-used-cryptocurrency/; Cecilia Chapiro, *Working Toward Financial Inclusion with Blockchain*, STANFORD SOCIAL INNOVATION REVIEW (Nov. 24, 2021), ssir.org/articles/entry/working_toward_financial_inclusion_with_blockchain.

[14] Thomas Franck, *One in 5 adults has invested in, traded in, or used cryptocurrency, NBC News poll shows*, NBC NEWS (Mar. 31, 2022), https://www.nbcnews.com/tech/tech-news/one-five-adults-invested-traded-used-cryptocurrency-nbc-news-poll-show-rcna22380.

[15] Testimony of Sheila Warren, *Joint Hearing of the California Assembly Banking & Finance Committee and the Senate Banking & Financial Institutions Committee* at 11 (Feb. 22, 2023), https://cryptofor-innovation.org/wp-content/uploads/2023/03/Sheila-Warren-Testimony-CA.pdf.

[16] *Crypto could help save people in the US billions of dollars a year in remittance fees*, COINBASE (Apr. 3, 2023), coinbase.com/blog/crypto-could-help-save-billions-of-dollars-remittance-fees.

[17] *2024 Annual Report: Crypto Philanthropy Data, Trends & Predictions* 4, THE GIVING BLOCK, go.thegivingblock.com/hubfs/Annual%20Report/TGB%20Annual%20Report%20-%20PRE-VIEW.pdf

used digital assets to host charitable auctions, and in doing so, have raised over $120,000 for pediatric cancer research and over $500,000 for Parkinson's and ALS research, as two examples.[18]

72.    Cryptocurrencies have also enabled individuals to more quickly donate to relief from international disasters and other crises. For example, approximately $6 million was donated to victims of earthquakes in Turkey and Syria in 2023[19], and the Ukrainian government has raised over $225 million in cryptocurrencies to support its Russian defense efforts[20].

## II.    Legal background

### A.    Congress's history of defining "broker"

73.    Since 1917, Congress has authorized the IRS and its predecessor agency to request information returns from "brokers" on Form 1099.

74.    The basic theory is that information returns from brokers will allow the IRS, if necessary, to doublecheck the returns from traders. For instance, say a trader used their Charles Schwab account to sell shares in a publicly traded company and made a profit. Charles Schwab, as the broker to that sale, is required to file a Form 1099 with the IRS reporting the trader's name, their identifying information, and the gains they made on the trade. When the trader files their taxes, the IRS can cross-check the trader's self-reported information against the broker's Form 1099.

---

[18] *Id.* at 19.

[19] *Crypto Donations Provide Fast Relief for Earthquake Victims in Turkey and Syria*, CHAINALYSIS (Feb. 21, 2023), chainalysis.com/blog/cryptocurrency-donations-provide-fast-relief-for-turkey-syria-earthquake-victims/#:~text=Crypto%20the%20same$20potential,to%20trans-fer%20funds%20across%20borders.

[20] Anna Baydakova, *Ukraine Has Raised $225M in Crypto to Fight Russian Invasion, but Donations Have Stagnated Over the Last Year: Crystal*, COINDESK (July 27, 2023), coindesk.com/consensus-maga-zine/2023/07/27/Ukraine-has-raised-225m-in-crypto-to-fight-russian-invasion-but-donations-have-stagnated-over-the-last-year-crystal/.

75. For much of the history between 1917 and today, the IRS defined "broker" by reference to the Securities Exchange Act of 1934, which defined broker as "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4). Thus, a broker was someone, like Charles Schwab, E-Trade, or JPMorgan, with whom customers would place trades that the broker would carry out.

76. Until recently, brokers subject to IRS reporting requirements have always been limited to persons carrying out trades on behalf of customers on regulated and centralized marketplaces, or, beginning in 1983, acting for customers in a trade or business in either an agency role (a person directing payments on behalf of customers), or as a principal (a person providing liquidity to the market).

77. Thus, federal statute requires any person "doing business as a broker" to file a form with the IRS that reveals particular information about each customer who does business with the broker. 26 U.S.C. § 6045(a).

78. A broker who does not file the required form is subject to monetary penalties. 26 U.S.C. § 6721.

79. Before 2021, Section 6045 defined, in part, "broker" to include any person "who (for a consideration) regularly acts as a middleman with respect to property or services." 26 U.S.C. § 6045(c)(1)(C).

80. In 2021, Congress considered legislation to add an additional definition of broker to capture the work of some third-parties that work in the blockchain industry. During that process, Congress considered, but ultimately did not adopt, legislation that would have amended the definition of broker to include "any person who (for consideration) regularly provides any service responsible for effectuating transfers of digital assets, *including any decentralized exchange or peer-to-peer marketplace*." BA Comment Letter 5 (emphasis added). Congress did not move forward with that legislation.

81.     Instead, that same Congress ultimately passed the Infrastructure Investment and Jobs Act (IIJA), which added a fourth definition of broker: "any person who (for consideration) is responsible for regularly providing any service effectuating transfers of digital assets on behalf of another person." 26 U.S.C. § 6045(c)(1)(D). The prior language, "including any decentralized exchange or peer-to-peer marketplace," was intentionally excluded, BA Comment Letter 5, but Congress reinforced that brokers are defined in relationship to "another person." This new provision was intended to address the "lack of clarity" on how the broker "rules apply to digital asset transactions" by providing that entities *already* "functioning as brokers" must report as such. Section 80603(a) was not intended "to impose new reporting requirements" nor to broaden the "definition of brokers."[21]

### B.     Treasury proposes regulations interpreting Section 6045.

82.     Congress expressly delegated some authority to Treasury to implement rules around brokers—for instance, the Secretary "may prescribe" regulations governing what information a broker needs to report. *See* 26 U.S.C. § 6045(a). But Congress did not expressly delegate any authority to Treasury to define the term "broker" in the first place. Instead, as noted, Congress defined the term itself: A broker is "any person who (for consideration) is responsible for regularly providing any service effectuating transfers of digital assets on behalf of another person." *Id.* § 6045(c)(1)(D).

---

[21] *Press Releases: On Senate Floor, Warner, Portman Conduct Colloquy Clarifying Cryptocurrency Provision in Infrastructure Investment & Jobs Act*, MARK R. WARNER: U.S. SENATOR FROM THE COMMONWEALTH OF VIRGINIA (Aug. 9, 2021), https://www.warner.senate.gov/public/index.cfm/2021/8/on-senate-floor-warner-portman-conduct-colloquy-clarifying-cryptocurrency-provision-in-infrastructure-investment-jobs-act.

Indeed, Treasury itself planned to consider crafting a regulation "based on principles broadly similar to those applicable under current law," which "impose[s] reporting obligations only on market participants engaged in business activities that provide them with access to information" necessary to report. Jonathan C. Davidson, *Letter from Department of the Treasury to United States Senate* 2-3 (Feb. 11, 2022), https://www.stradley.com/-/media/files/publications/2022/02/crypto-davidson-letter.pdf?la=en&rev=b70305b.

83.     Nonetheless, in 2023, the Secretary of the Treasury issued a Notice of Proposed Rule-making purporting to interpret and implement the definition of "broker" in the newly amended § 6045.

84.     The Proposed Rule offered an expansive definition of the term "broker" through a series of nested definitions that lead further and further away from Congress's definition of the term. As described below, the Proposed Rule purported to transform the definition of "broker" Congress adopted in the IIJA to include DeFi industry participants who create or offer technology that may be used to facilitate sales, for free, including by providing "access to digital asset trading platforms" (like websites or software developers) and "services to discover the most competitive buy and sell prices."

85.     Before the Proposed Rule, Treasury defined broker as "any person … that, in the ordinary course of a trade or business during the calendar year, stands ready to *effect* sales to be made by others." 26 C.F.R. § 1.6045-1(a)(1) (emphasis added). To "effect" means "to put into operation." *Effect*, Merriam-Webster's Online Dictionary (last visited Dec. 27, 2024), https://www.merriam-webster.com/dictionary/effect. Under this definition, Treasury's own "view" was that "ancillary parties who cannot get access to information that is useful to the IRS"—such as "persons who are only selling storage devices used to hold private keys or persons who merely write software code"—"are not carrying out broker activities."[22]

86.     Through successive definitions of "effect," "digital asset middleman," and "facilitative service," however, the Proposed Rule purported to transform the term "broker" to be completely unrecognizable when compared to Congress's definition in 26 U.S.C. § 6045(c)(1)(D). While Congress required brokers to effectuate transfers of digital assets, the Proposed Rule purported to define brokers as any parties capable of providing facilitative services to a digital asset transaction.

---

[22] *Letter from Department of the Treasury to United States Senate* 2.

87.    The Proposed Rule began its trail away from Congress's definition by defining the word "effect" in the IRS's then-current definition of broker to include acting as "a digital asset middleman as defined in [the Proposed Rule] for a party in a sale of digital assets." 89 Fed. Reg. at 59,632 (Prop. Treas. Reg. § 1.6045-1(a)(10)(ii) & (iv)).

88.    Then, the proposed regulations defined "digital asset middleman" as any "person who provides a facilitative service as described in [the proposed regulations] with respect to a sale of digital assets wherein the nature of the service arrangement is such that the person ordinarily would know or be in a position to know the identity of the party that makes the sale and the nature of the transaction potentially giving rise to gross proceeds from the sale." *Id.* at 59,633 (Prop. Treas. Reg. § 1.6045-1(a)(21)(i)). To "facilitate" means "to make (something) easier" or "to help bring (something) about." *Facilitate*, Merriam-Webster's, https://www.merriam-webster.com/dictionary/facilitate.

89.    The Proposed Rule then explained that a person ordinarily knows, or is in a position to know, the identity of a party that makes the sale "if that person maintains sufficient control or influence over the facilitative services provided to have the ability to set or change the terms under which its services are provided to request that the party making the sale provide that party's name, address, and taxpayer identification number upon request." 89 Fed. Reg at 59,633 (Prop. Treas. Reg. § 1.6045-1(a)(21)(ii)(A)).

90.    Then, the Proposed Rule explained that a person ordinarily knows, or is in a position to know, the nature of the transaction potentially giving rise to gross proceeds from a sale if "that person maintains sufficient control or influence over the facilitative services provided to have the ability to determine whether and the extent to which the transfer of digital assets involved in a transaction gives rise to gross proceeds, including by reference to the consideration that the person receives or pursuant to the operations of or modifications to an automatically executing contract or protocol to which the person provides access." *Id.* at 59,634 (Prop. Treas. Reg. § 1.6045-1(a)(21)(ii)(B)).

91.     The Proposed Rule also provided examples of what, in Treasury's view, counts as a facilitative service. Facilitative services include providing access to digital asset trading services, providing market-making functions, and providing services to discover the most competitive buy and sell prices. *Id.* (Prop. Treas. Reg. § 1.6045-1(a)(21)(ii)(B)).

92.     In addition to altering the definition of "broker," the Proposed Rule also adopted a new definition of the term "sales" that includes "[a]ny disposition of a digital asset in exchange for a different digital asset." *Id.* at 59,632 (Prop. Treas. Reg. § 1.6045-1(a)(9)(ii)(A)).

93.     The proposed definition of "sales" differed from the Treasury's treatment of sales used for non-digital assets; Treasury defines sales in that context "only to the extent any of [the enumerated] dispositions are conducted for cash." *Id.* at 59,631 (Treas. Reg. § 1.6045-1(a)(9)).

### C.     Plaintiffs warn Treasury that its Proposed Rule is unlawful.

94.     While Plaintiffs and their members fall outside Congress's statutory definition of "broker," because they do not effectuate transactions for consideration on behalf of third parties, they arguably fall inside Treasury's Proposed Rule. So Blockchain Association and DEF, along with thousands of others, each filed comment letters in response to the Proposed Rule, detailing how the Proposed Rule, if promulgated, would be unlawful and unconstitutional. *See* BA Comment Letter; DEF Comment Letter.

95.     The comment letters detailed the significant harm that the Proposed Rule, if issued, would have on Plaintiffs and their members. Specifically, Blockchain Association told Treasury that decentralized participants would be "fundamentally unable to comply" with the Proposed Rule, because there is no centralized party who can edit software and instances of protocols to comply with the Proposed Rule's requirements. *See* BA Comment Letter 21-22. Thus, Blockchain Association told Treasury, treating DeFi entities as "brokers" would destroy the fundamental benefit of the DeFi industry—that it operates *without* intermediaries. Likewise, DEF told Treasury that "it is highly probable

that, in many situations, the Proposed Rule would impose insurmountable costs on market partici-

pants that deprive them of the ability to continue operating." DEF Comment Letter 16. And even if

DeFi could comply, doing so would destroy its fundamental premise—allowing users to transact di-

rectly with each other. BA Comment Letter 22. Specifically, commenters told Treasury that wallet

software developers and other developers of software used to transact on the blockchain do not collect

information about users, hold assets, set up user accounts, or track user transactions. *See id.* Moreover,

imposing such requirements on products that are not set up in any way to do so would be to impose

a massive, and in many cases impossible, burden. *See id.*

96.     Plaintiffs also submitted two letters under the Paperwork Reduction Act explaining

that complying with the Proposed Rule each year would take approximately 4 billion hours and would

cost $260 billion based on the IRS's own estimates. BA Paperwork Reduction Act Letter 3-4; Joint

Second Paperwork Reduction Act Letter 4, 6.

97.     The comment letters also argued that the Proposed Rule would exceed Treasury's stat-

utory authority and be unconstitutional. *See* BA Comment Letter 26-33; DEF Comment Letter 4-12.

98.     The Proposed Rule would exceed Treasury's statutory authority, the letters explained,

because it would expand the definition of "broker" far beyond the text of the IIJA. While Congress

limited the definition of broker to entities who are "responsible for regularly providing any service

effectuating transfers of digital assets on behalf of another person," 26 U.S.C. § 6045(c)(1)(D), the

regulations explicitly define as brokers entities who do not actually effectuate transactions. BA Com-

ment Letter 27-28; DEF Comment Letter 7-9; *see* Consensys Software Comment Letter 7-11. While

the statute requires brokers to "effectuat[e] transfers of digital assets," the regulations define as a bro-

ker all entities who might provide "facilitative services" related to transactions, including apps and

internet service providers who might help users transact. BA Comment Letter 27-28. And while the

statute requires the entity to "regularly provid[e]" broker services, the regulations sweep in entities

who "stand[] ready" to provide facilitative services. *Id.* Thus, Blockchain Association explained, the regulations exceed statutory authority.

99.    Blockchain Association and DEF also explained that the Proposed Rule would be unconstitutional. *See* BA Comment Letter 29-33; DEF Comment Letter 12-14.

100.    The Proposed Rule, if promulgated, would violate the Fourth Amendment rights of two separate parties: the participants in digital asset transactions and the entities who would be labeled as brokers. As to participants, the Proposed Rule would result in the linking of wallet application addresses to personal identities, thus exposing each user's entire transaction history—how much every digital asset holder bought, sold, transferred, or donated, and to whom—to anyone around the world. BA Comment Letter 10. That large quantity of information would reveal information about the traders' most intimate activities. *See Riley v. California*, 573 U.S. 373, 395 (2014). As to those who could be labeled brokers, the Proposed Rule violates the Fourth Amendment rights of those parties by requiring them to collect and report to the government vast quantities of information. *See, e.g., Patel v. City of Los Angeles*, 738 F.3d 1058, 1061 (9th Cir. 2013) (en banc), *aff'd*, 576 U.S. 409 (2015). Those entities have a possessory and ownership interest in the records of transacting parties, and the entities have no opportunity to challenge the reporting requirement before a neutral decisionmaker. That, too, violates the Fourth Amendment. BA Comment Letter 30-31; DEF Comment Letter 12-14.

101.    The Proposed Rule, if promulgated, would violate the Fifth Amendment's Due Process Clause because the expansive and vague definitions of "broker" do not give fair notice to regulated parties. BA Comment Letter 31; DEF Comment Letter 14; *see* Consensys Software Comment Letter 11. Indeed, commenters warned that the regulations could sweep in validators or block builders—adding additional uncertainty. *See* BA Comment Letter 24-25; DEF Comment Letter 27.

102.    Finally, Blockchain Association argued that the Proposed Rule violated the APA in three additional ways: (1) It was not supported by substantial evidence, because Treasury failed to

quantify the benefits (it did not quantify the tax gap from digital asset transactions) and failed to adequately consider the burdens on regulated parties, BA Comment Letter 32; (2) it treated traditional finance and decentralized finance differently without justification, including in adopting different definitions of "sales" for digital and non-digital assets without explanation, *id.* at 7, 32; and (3) the vagueness problems that render the Proposed Rule unconstitutional also rendered it arbitrary and capricious, *id.* at 32-33.

### D.     Plaintiffs warn Treasury that its Proposed Rule represents an existential threat to the DeFi community.

103.     Both Blockchain Association and DEF's comment letters also detailed the harms that the Proposed Rule would cause, particularly to decentralized finance industry participants.

104.     The letters described how decentralized finance participants are "fundamentally unable to comply" with the regulations. *See* BA Comment Letter 9; DEF Comment Letter 16. As described above, once the "smart contracts" that make up a DeFi protocol are written by developers and then deployed, they operate automatically, *see Van Loon*, 122 F.4th at 553; governance of the protocols is distributed to users, so altering the protocols to comply with the regulations is impossible. BA Comment Letter 10.

105.     Blockchain Association also explained that requiring DeFi industry participants to collect user data would destroy the very purposes of DeFi: that users can transact without intermediaries and without revealing their identities. *Accord* Consensys Software Comment Letter 20-23. Because all transactions that occur under the DeFi model typically are public (but pseudonymous), creating an intermediary responsible for collecting and disclosing the identities of parties associated with those transactions would represent a fundamental shift in the DeFi model. *Id.* at 10. Thus, Blockchain Association explained, if the Proposed Rule was enacted, DeFi "would ultimately cease to exist." *Id.* at 22; *see also* DEF Comment Letter 16; Comment from Uniswap Foundation at 7-8, IRS Doc. No. IRS-2023-0041-0001, *available at* https://www.regulations.gov/comment/IRS-2023-0041-44266.

106.    So too with non-custodial wallet software developers, Blockchain Association explained. *See* BA Comment Letter 19-21. Only the digital asset owners can access the assets inside their non-custodial wallet applications. But the Proposed Rule would seemingly require non-custodial wallet developers and providers to perform back-up withholding (that is, a tax withholding from a payment when the recipient fails to provide certain information), which would require the non-custodial wallet developers and providers to actually be able to access the assets inside the account. That would fundamentally change the nature of non-custodial wallet applications, making them custodial. *Id.*; *accord* Uniswap Comment Letter 7-8; Consensys Software Comment Letter 14.

107.    Both Blockchain Association and DEF also submitted letters in response to the Department of the Treasury's release of a draft Form 1099-DA, which required public comment under the Paperwork Reduction Act. *See* BA Paperwork Reduction Act Letter; DEF Paperwork Reduction Act Letter (Exhibit 4).

108.    In those letters, Plaintiffs explained that the Proposed Rule would impose existential harms on regulated parties.

109.    Blockchain Association explained that the Proposed Rule would result in "at least four billion total annual burden hours" for regulated parties to prepare Forms 1099-DA. BA Paperwork Reduction Act Letter 3. That is because the IRS itself estimated that filling out each form takes approximately 30 minutes, and that as a result of the Proposed Rule, regulated parties will complete approximately eight billion forms. *See id.*; Jonathan Curry, *IRS Prepping for at Least 8 Billion Crypto Information Returns*, TAX NOTES (Oct. 26, 2023), www.taxnotes.com/featured-news/irs-prepping-least-8-billion-crypto-information-returns/2023/10/23/7hhdp. The IRS also estimated the human cost of preparing the required form is around $63 an hour—so the total financial burden on regulated parties is on the order of $260 billion per year. Joint Second Paperwork Reduction Act Letter 6.

110.    DEF calculated that the regulations would impose "an annualized cost on brokers of approximately $75.2 billion in the aggregate, or $14.9 million per broker, in each case disregarding startup costs." DEF Paperwork Reduction Act Letter 5. These costs would be "insurmountable" for many decentralized finance industry participants, who would be put out of business (or would move overseas) if the regulations were adopted. *Id.* at 6; *see* Joint Second Paperwork Reduction Act Letter 5.

**E.    Treasury promulgates a final rule as to centralized parties.**

111.    On June 28, 2024, Treasury announced that it had finalized a rule as to centralized exchanges. Treasury explained that it would "focus its enforcement resources on taxpayers who are more likely to have underreported their income from digital asset transactions and custodial brokers … who may not be meeting their reporting obligations." *Gross Proceeds and Basis Reporting by Brokers and Determination of Amount Realized and Basis for Digital Asset Transactions*, 89 Fed. Reg. 56,480, 56,492 (July 9, 2024). In contrast, Treasury declined to finalize rules "that apply to non-custodial industry participants"; as for those entities, Treasury would "continue to study th[e] area" and would issue a final rule after further consideration. *Id.*

112.    As for centralized exchanges, the rule defines "broker" as including any person who "in the ordinary course of a trade or business during the calendar year, stands ready to effect sales to be made by others." *Id.* at 56,550 (§ 1.6045-1(a)(1)).

113.    The rule then defines "effect." To effect a sale means to act as an "agent for a party in the sale wherein the nature of the agency is such that the agent ordinarily would know the gross proceeds from the sale," or a "principal that is a dealer in such sale," or a "digital asset middleman as defined in paragraph (a)(21) of this section." *Id.* at 56,552 (§ 1.6045-1(a)(10)).

114.    The rule defines "digital asset middleman" as "any person who provides a facilitative service as described in paragraph (a)(21)(iii) of this section," *id.* at 56,553 (§ 1.6045-1(a)(21)), but the rule then reserves the definition of "facilitative service," *id.* (§ 1.6045-1(a)(21)(iii)).

115.    The rule provided particular rules that apply to the sale of digital assets. For those sales, the rules define "broker" as including "*only* a U.S. digital asset broker as defined in paragraph (g)(4)(i)(A)(*1*) of this section," cross-referencing a later definition that provides that a "digital asset broker is a person that effects sales of digital assets on behalf of others and that is … a U.S. payor or U.S. middleman as defined in § 1.6049-5(c)(5)(i)(B) or (F)." *Id.* at 56,550, 56,574 (emphasis added).

116.    For sales of digital assets, the rule defines providing a facilitative service as including five activities, including any "payment service performed by a processor of digital asset payments described in paragraph (a)(22) of this section, provided the processor of digital asset payments has actual knowledge or ordinarily would know the nature of the transaction and the gross proceeds there-from." *Id.* at 56,553 (§ 1.6045-1(a)(21)(iii)(B)(4)). Paragraph (a)(22) defines a "processor of digital asset payments" as a person "who in the ordinary course of a trade or business stands ready to effect sales of digital assets … by regularly facilitating payments from one party to a second party by receiving digital assets from the first party and paying those digital assets, cash, or different digital assets to the second party." *Id.* (§ 1.6045-1(a)(22)).

117.    "In the case of a sale of a digital asset," the rule defines broker as including only "a person that effects sales of digital assets on behalf of others and that is … [a] U.S. payor or U.S. middleman as defined in § 1.6049-5(c)(5)(i)(A)." *Id.* at 56,574 (§ 1.6045-1(g)(4)(i)(A)(1)). The cross-referenced definition of middleman is any person "who makes payment of interest for, or collects interest on behalf of, another person, or otherwise acts in a capacity as intermediary between a payor and a payee." 26 C.F.R. § 1.6049-4(f)(4).

## F.    Treasury promulgates its Final Rule for decentralized finance industry participants.

118.    On December 27, 2024, Treasury announced its rule for DeFi participants. The Final Rule replaces the Proposed Rule's definition of "facilitative service" with the terms "effectuating

service" and "trading front-end service." Final Rule ¶ (a)(21)(i), (iii). Despite the new term, the Final Rule poses the same statutory and constitutional problems as the Proposed Rule.

119.    The Final Rule takes the same nesting-definitions approach as the Proposed Rule. A broker is someone who acts as a "digital asset middleman," which the Final Rule defines as any person "who is responsible for providing an effectuating service." *Id.* ¶ (a)(21). An "effectuating service," in turn, is defined in part as any service with respect to the sale of digital assets that is a "trading front-end service," and the "nature of the service arrangement is such that the person providing the service ordinarily would know or be in a position to know … the nature of the transaction." *Id.* ¶ (a)(21)(i)(A).

120.    The Final Rule then defines a "trading front-end service" as a service that "receives a person's order to sell and processes that order for execution by providing user interface services" that are designed to "[e]nable" the user "to input order details with respect to a transaction to be carried out or settled" on a distributed ledger, and "transmits order details so that the transaction can be carried out or settled" on the distributed ledger. *Id.* ¶ (a)(21)(iii)(A).

121.    The Final Rule covers providers of trading front-end services who "ordinarily would know or be in a position to know" the nature of the transaction that results in proceeds from the sale of digital assets. *Id.* ¶ (a)(21)(i)(A). The Final Rule defines "position to know" as maintaining "control or sufficient influence over the trading front-end services to have the ability to determine" whether the transaction resulted in gross proceeds. *Id.* ¶ (a)(21)(i)(B)(ii). The Final Rule measures maintaining control or influence as the "ability to collect the fees charged for those services… whether or not the person actually collects fees in this manner." *Id.*

122.    As with the Proposed Rule, the Final Rule uses all of the above nested definitions to significantly expand Congress's statutory definition of "broker" well beyond what Congress intended. Congress's constrained definition reaches only entities that "effectuate[]" transactions "for consideration." Conversely, the Final Rule's definition sweeps in both software providers that do not effectuate

- 33 -

transactions as well as software providers that do not collect consideration. For example, the definition of "trading front-end services" sweeps in providers of software tools, including graphical user interfaces, that do not themselves effectuate transfers but instead merely enable users to engage with smart contracts to make transfers of assets in their custody without using third-party intermediaries. Users effectuate the transfers using their private keys, the front-end interface software does not. Moreover, the Final Rule's definition of "position to know" sweeps in front-end software that is free to use, disregarding Congress's requirement that brokers provide their services "for consideration." 26 U.S.C. § 6045(c)(1)(D).

123.    By sweeping under the definition of "broker" any software provider that merely enables users to effectuate their own transactions using other DeFi software, the Final Rule broadens the definition to include service providers (potentially even Internet Service Providers) that "indirectly" effectuate transactions—precisely what Treasury and the IRS agree "is too broad" under the statutory definition of broker. *See* Final Rule pp. 20, 43.

124.    Moreover, non-custodial software providers do not act as agents of users who transact in digital assets. They also do not act as principals in those transactions. And they do not take custody or have access to a user's private keys or digital assets. At most, they may make it easier for users to effectuate their own DeFi transactions. But that does not mean the software providers "effectuate" those transactions.

125.    In short, just like the Proposed Rule, the Final Rule rests on nesting definitions to apply to parties who are not those who regularly "effectuat[es] transfers of digital assets" "for consideration" "on behalf of another person" (what *Congress* said, 26 U.S.C. § 6045(c)(1)(D)). Put differently, the Final Rule confuses a tool that digital asset holders can use for free to engage with smart contracts themselves, on the one hand, with brokers who regularly and actually carry out transactions for consideration, on the other. Those are not the same thing. Treasury's attempt to redefine "broker" exceeds

Treasury's authority, because the Final Rule's definition goes beyond the statute's, and Congress did not delegate to Treasury any authority to redefine the term, meaning Treasury's definition is entitled to no deference. *See Loper Bright Enterprises*, 144 S. Ct. 2244.

**G.    Treasury's Final Rule fails to consider substantive comments raised during notice-and-comment.**

126.    In its haste to enact a Final Rule, Treasury failed to adequately consider several substantive comments raised by commenters.

127.    For example, Treasury failed to consider that the Final Rule will require some new "brokers" to fundamentally change their business models. *See* DEF Comment Letter 18-21 (explaining front ends).

128.    Likewise, Treasury failed to consider Plaintiffs' concern that the Proposed Rule did not clarify when a sale by a non-U.S. "broker" would be "treated as effected from *within* the United States." DEF Comment Letter 34-35; *see* BA Comment Letter 22. DEF recommended that Treasury "clearly delineate the criteria necessary to avoid application of the Proposed Regulations to entities outside the United States," DEF Comment Letter 35, but Treasury failed to respond.

129.    Treasury also failed to conduct an adequate cost-benefit analysis in the Final Rule. Instead, Treasury merely acknowledged that it "understand[s] that these final regulations will impose costs on DeFi participants," Final Rule p. 98—an understatement—but failed to explain how, in its view, these costs are outweighed by benefits.

**CAUSES OF ACTION**

**COUNT I**

**Violation of Administrative Procedure Act, 5 U.S.C. § 706:
Exceeds Statutory Authority**

130.    Plaintiffs repeat and incorporate by reference all of the allegations above.

131.    The APA provides that "[t]he reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

132.    The IIJA defines "broker" as "any person who (for consideration) is responsible for regularly providing any service effectuating transfers of digital assets on behalf of another person." 26 U.S.C. § 6045(c)(1)(D).

133.    The Final Rule exceeds Treasury's statutory authority to interpret the term "broker" through a series of definitions that, taken together, define as "brokers" persons and entities that are not covered under Congress's definition of that term. *See Loper Bright Enterprises*, 141 S. Ct. at 2247.

134.    Treasury's interpretation of "broker," and its definitions, including "effect," "digital asset middleman," "trading front-end service," and "position to know," conflict with the IIJA and exceed Treasury's statutory authority.

135.    For these reasons, Treasury's adoption of the Final Rule was not in accordance with law. The court should therefore "hold unlawful and set aside" the Final Rule. 5 U.S.C. § 706.

## COUNT II

**Violation of Administrative Procedure Act, 5 U.S.C. § 706:**
**Arbitrary and Capricious, Lack of Substantial Evidence, Lack of Reasoned Decisionmaking**

136.    Plaintiffs repeat and incorporate by reference all of the above allegations.

137.    The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be … unsupported by substantial evidence." 5 U.S.C. § 706(2)(E).

138.    An agency fails substantial evidence review if it ignores evidence that undercuts its judgment or discounts evidence without adequate explanation. *Morall v. Drug Enforcement Administration*, 412 F.3d 165, 179-80 (D.C. Cir. 2005).

139.    The APA also requires federal agencies to "articulate a satisfactory explanation for [their] action[s]" and establish a "rational connection between the facts found and the choice made."

*Motor Vehicle Manufacturers Association of U.S. v. State Farm Mutual Automobile Insurance*, 463 U.S. 29, 43 (1983).

140.     In addition, the reviewing court must decide "whether the agency addressed any significant points … raised by the public comments." *Mexican Gulf Fishing Co. v. United States Department of Commerce*, 60 F.4th 956, 971 (5th Cir. 2023).

141.     The Final Rule violates the APA for all these reasons.

142.     The Final Rule is unsupported by substantial evidence as to both the benefits of the regulation and the burdens on the parties. Treasury did not quantify the "tax gap" that result from digital asset transactions, and it did not accurately quantify the substantial burdens that the Final Rule imposes on regulated parties. Indeed, Treasury estimated the burden to be approximately 2 million hours, but a more accurate estimation is at least four billion hours. BA Paperwork Reduction Act Letter 2-3; Joint Second Paperwork Reduction Act Letter 4. And Treasury estimated the financial burden to be approximately $136 million, but a more accurate estimate is $260 billion. Joint Second Paperwork Reduction Act Letter 6. What's more, those estimates do not include the time and money necessary for DeFi industry participants to collect and store users' personal information.

143.     Relatedly, Treasury failed to meaningfully respond to the concerns Plaintiffs raised in their comment letters, and adequately weigh the costs and benefits. Indeed, Treasury failed to consider that the Final Rule will require some front-end services to fundamentally change their business models.

144.     As a result, the Final Rule is also arbitrary or capricious because it treats DeFi and traditional finance the same, without recognizing the significant and meaningful differences between the two.

145.     The Final Rule is further arbitrary or capricious because it is so vague that it is not reasonable or reasonably explained; it offers no meaningful guidance to regulated parties about whether they are even subject to the reporting requirements.

146.    For these reasons, Treasury's adoption of the Final Rule was not in accordance with law. The Court should therefore "hold unlawful and set aside" the Final Rule. 5 U.S.C. § 706.

## COUNT III

**Violation of Administrative Procedure Act, 5 U.S.C. § 706:**
**Contrary to Constitutional Right – Fourth Amendment**

147.    Plaintiffs repeat and incorporate by reference all of the above allegations.

148.    The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be … contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

149.    The Final Rule violates the Fourth Amendment for two separate reasons. *First*, it violates the rights of participants to a transaction using decentralized finance, because those participants have a reasonable expectation of privacy in their identifying information, which the Final Rule requires them to disclose to a third party, and ultimately to the government. Connecting personal identities to transactions on the blockchain (which are pseudonymous) would reveal vast troves of personal information to the world, including whom people bought digital assets from and sold them to. *Second*, the Final Rule violates the Fourth Amendment rights of third parties who are required to collect and report vast quantities of information about their users to the government. *See, e.g.*, *Patel*, 738 F.3d at 1061.

150.    For these reasons, Treasury's adoption of the Final Rule was not in accordance with law. The court should therefore "hold unlawful and set aside" the Final Rule. 5 U.S.C. § 706.

## COUNT IV

**Violation of Administrative Procedure Act, 5 U.S.C. § 706:**
**Contrary to Constitutional Right – Fifth Amendment**

151.    Plaintiffs repeat and incorporate by reference all of the above allegations.

152.     The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be … contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

153.     The Final Rule is unconstitutional in violation of the Fifth Amendment's Due Process Clause, which requires Treasury to "give fair notice of conduct that is forbidden" and establish adequate standards to prevent "seriously discriminatory enforcement." *Federal Communications Commission v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

154.     The Final Rule fails to give regulated parties fair notice because it requires regulated parties to guess as to whether they must comply with the Final Rule or not. For instance, the Final Rule applies to a party if they "ordinarily would know or be in a position to know the nature of the transaction potentially giving rise to gross proceeds from a sale of digital assets," Final Rule ¶ (a)(21)(B)(ii), but that does not offer clarity to potentially regulated parties. The Final Rule is vague, in violation of the Fifth Amendment.

155.     The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

156.     For these reasons, Treasury's adoption of the Final Rule was not in accordance with law. The court should therefore "hold unlawful and set aside" the Final Rule. *Id.* § 706.

### PRAYER FOR RELIEF

157.     Plaintiffs respectfully request that this Court enter judgment in their favor against Defendants and provide the following relief:

      a.     A declaratory judgment that the Final Rule is arbitrary, capricious, or otherwise contrary to law within the meaning of the APA, *see id.* § 706(2)(A);

b.    An order vacating and setting aside the Final Rule in its entirety pursuant to the APA, *see id.* § 706(2);

c.    An order enjoining Treasury from enforcing the Final Rule against Plaintiffs' members and other blockchain industry participants;

d.    An order awarding Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action; and

e.    Any other and further relief that the Court deems just and equitable.

DATED: December 27, 2024                    Respectfully Submitted,


                                            By:  */s/ Randy D. Gordon*
                                                 Randy D. Gordon


Nathan W. Giesselman*                        Shay Dvoretzky*
California Bar No. 290700                     DC Bar No. 498527
nathan.giesselman@skadden.com                shay.dvoretzky@skadden.com
SKADDEN, ARPS, SLATE,                         Christopher P. Bowers*
  MEAGHER & FLOM LLP                          DC Bar No. 468117
525 University Ave.                           chris.bowers@skadden.com
Palo Alto, CA 94301                           Parker Rider-Longmaid*
Telephone:  (650) 470-4500                    DC Bar No. 1552207
Facsimile:   (650) 470-4570                   parker.rider-longmaid@skadden.com
                                             Steven Marcus*
Juliana D. Hunter                             DC Bar No. 1630882
Texas Bar No. 24075194                        steven.marcus@skadden.com
juliana.hunter@skadden.com                    Hanaa Khan*
SKADDEN, ARPS, SLATE,                         DC Bar No. 1735386
  MEAGHER & FLOM LLP                          hanaa.khan@skadden.com
1000 Louisiana St., Ste. 6800                 SKADDEN, ARPS, SLATE,
Houston, TX 77002                               MEAGHER & FLOM LLP
Telephone:  (713) 655-5100                    1440 New York Ave., NW
Facsimile:   (713) 655-5200                   Washington, DC 20005
                                             Telephone:  (202) 371-7000
                                             Facsimile:   (202) 393-5760

Randy D. Gordon
Texas Bar No. 00797838
rdgordon@duanemorris.com
Jason E. Boatright
Texas Bar No. 24048138
jeboatright@duanemorris.com
Joseph M. Cox
Texas Bar No. 04950200
jmcox@duanemorris.com
Craig M. Warner
Texas Bar No. 24084158
cmwarner@duanemorris.com
Lucas Wohlford
Texas Bar No. 24070871
lwohlford@duanemorris.com
DUANE MORRIS LLP
100 Crescent Ct., Ste. 1200
Dallas, TX 75201
Telephone:  (214) 257-7200
Facsimile:   (214) 257-7201

Alexander C. Drylewski
New York Bar No. 4847844
alexander.drylewski@skadden.com
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Telephone:  (212) 735-3000
Facsimile:   (212) 735-2000

Roger C. Diseker
Texas Bar No. 00787371
rdiseker@duanemorris.com
DUANE MORRIS LLP
777 Main St., Ste. 2790
Fort Worth, TX 76102
Telephone: (817) 704-1000
Facsimile: (817) 704-1001

*Attorneys for Plaintiffs Blockchain Association, Texas Blockchain Council, and DeFi Education Fund*
*\*Pro hac vice motion forthcoming*